**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

**RODNEY HORNE** **PLAINTIFF**

**v.** **NO. 3:24-cv-191 JM**

**JAMES MICHAEL TEAGUE;**
**COREY JAMES RAINS;**
**CHRISTOPHER MICHAEL LAWRENCE;**
**MARTY DANIEL BOYD, Craighead**
**County Sheriff; COUNTY OF CRAIGHEAD; and**
**JOHN DOES 1-5** **DEFENDANTS**

# ORDER

Rodney Horne was arrested late one night in the bedroom of his home, without a warrant, because of underage drinking on his property. He brings claims pursuant to 42 U.S.C. § 1983 and the Arkansas Civil Rights Act (ACRA)[1] against three Craighead County officers for unlawful entry, unlawful arrest, and excessive force. He also brings state law claims for invasion of privacy and § 1983 municipal claims against Craighead County and individual liability claims against Sheriff Marty Boyd. Defendants have moved for summary judgment on all claims and invoke qualified immunity on the individual capacity claims against the officers.

## I. Factual Background

On the night of June 3, 2023, Officers James Micheal Teague and Corey James Rains were dispatched to the Horne property in rural Craighead County following a report of underage drinking at the property. The officers were aware that a large party had occurred at the same location several months earlier, at the eighteenth birthday party for Horne's son, Beau Horne.

The Hornes own forty acres with a long driveway leading to a house and barn, which is separated from the house by the width of a driveway. The body camera footage from Officers

[1] Ark. Code Ann. § 16-123-101, *et seq.*

Teague and Rains shows much of what happened when they got to the property. The driveway was lined with vehicles. The officers parked and spoke to several guests[2] sitting in one of the vehicles. Teague asked what was going on there, and one of the guests responded that everyone was just hanging out. Teague asked if anyone was drinking, and the guest said he didn't think so. Teague asked if there was a parent there, and the guest said yes, the dad was there standing next to a black car. The guests said they were leaving, and Teague told them to be careful.

As the officers continued to walk up the driveway, someone closed the garage door to the barn and turned off the lights. The officers saw two guests came out of the house. They were friendly with the officers. One of these guests said that he knew people were going to jail since they had been given a warning last time. When Teague asked if there were any parents around, the other guest said the guy who owns the house was inside using the bathroom, and the other guest said, "He'll be out in a second, I told him." Beau came from the barn and approached the officers. Teague asked Beau if the guests were "of age," and Beau responded no, but that nobody was planning to leave. Beau left after a few seconds and walked back to the barn. The officers commented that they could hear cooler lids shutting and bottles clinking from inside the barn. Sgt. Christopher Michael Lawrence arrived and joined Teague and Rains.

Beau came back from the barn and told the officers that his dad was in bed, asleep. Lawrence told Beau they needed to talk to his father. Beau refused the deputies, saying "this is my deal" and he was not going to wake his father up. He denied that his father had anything to do with the situation. Lawrence sharply told Beau that he needed to start getting everybody out of there, "right now." Beau walked away and then turned back and asked if it was ok if everyone stayed there. Teague responded by telling Beau that the officers needed to talk to his dad. Beau

[2] It is undisputed that all the guests were under the age of twenty-one.

repeated that his dad was asleep. Teague asked Beau to wake him up, and Beau walked towards the house saying he would try.

At that point Teague and Rains walked towards the barn. Some of the guests scattered to the woods behind the barn. Teague and Rains walked through the barn with their flashlights and talked to some of the guests. There was no sense of urgency. Beer cans and beer bottles were visible on the tables in the barn. The guests that the officers spoke to either denied drinking or said they had sober rides and were allowed to leave.

What happens next is not caught on a body camera.[3] Lawrence testified that he spoke again with Beau outside the house while Rains and Teague investigated in the barn. Lawrence testified that "I was standing close to the front door and I saw more individuals inside the house and I asked [Beau] if I could step in and talk to them as well, and he said yes, that's fine." (Doc. No. 18-1, p. 21). Lawrence further testified that after he went inside, he radioed Teague and Rains and told them to come inside the house. Beau, on the other hand, testified that he was "not sure" if he and Lawrence talked outside the house, and that Lawrence "might have walked in right behind me, [or] he might not have." (Doc. No. 18-6 p. 15). When Beau was asked if he told Lawrence he "couldn't go inside," Beau responded, "I never told him he could or couldn't." (Doc. No. 18-6, p. 16). The parties agree that consent is a disputed material fact.

The body camera coverage picks back up when Teague enters the house. Lawrence was standing in the entry of the living room as were several guests and Beau. Lawrence asked Teague if he had talked to Horne yet. When Teague said no, Lawrence asked Beau if he had gotten his dad up yet. Beau said no and repeated that his dad was asleep. At that point Lawrence told Beau

[3] No body camera footage was submitted for Seargeant Lawrence. It was not preserved because Lawrence did not write a narrative of the incident.

to go and get him or "we'll have to." Beau said the officers could talk to him instead of his father, because "this is my party." Lawrence said, "It doesn't matter, it's on his property, we have to talk to him." Beau left the room. At that point one of the guests in the living room volunteered that the dad was out there drinking with guests earlier. Beau stepped back into the living room and relayed what his dad had said—that the officers could come back there and talk to him if they wanted, that he was in bed.

When the officers walked into the bedroom, Horne was lying in his bed, arms crossed behind his head. Teague said, "Man, we're out here again for the same thing. You've got a bunch of underage kids drinking on your property. So it's a problem." Horne said, "Talk to them, not me." Teague said, "It's your property." Horne replied that he didn't care. Teague told Horne to get up. Horne said "no, I'm good." Teague repeated "hop up for me," and Horne repeated "no, I'm good." Horne told the officers to go back outside. Then Horne sat up in bed with his phone in hand and started dialing. Teague again said "hop up for me," and Horne said no. After a few seconds, Rains reached for the bed covers but Horne pulled back and said, "You don't touch my shit!" The officers pulled the covers off while Horne stayed on his phone.

The phone could be heard ringing, and Teague again said "hop up for me." Horne refused, saying "stay off of me, don't touch me and get out of my house!" He told the officers they were trespassing. He was asked again to get up and he said no, that he was calling the sheriff, Marty Boyd. At that point, Rains reached across the bed and knocked Horne's phone away while grabbing him and pulling him out of bed. Rains and Teague took Horne down to the floor and handcuffed him. In the scuffle, the actions of each of the officers are not clear. Horne said he was not fighting. His son could be heard telling his father to give the officers his hands. Horne was only wearing his underwear and socks. He asked for his clothes several times and was

told no, "No, you had your chance to put on clothes." Teague walked Horne out of the house wearing only his underwear, down the driveway past the guests, some of whom were videoing the incident.[4] After he was in the officer's vehicle Teague told Horne that he was arrested for contributing to the delinquency of a minor, a misdemeanor, pursuant to Ark. Code Ann. § 5-4-102.[5]

After Horne was in the police vehicle, Rains walked back up to the area between the house and the barn where Lawrence stood talking to a group of guests. Lawrence asked if everyone had a sober ride home, told them they needed to stop gathering like this, and sent the guests on their way. Horne later filed this action. This case is complicated by the overlapping but not identical actions of the three officers.

## II. Legal Standard

Summary judgment is appropriate only when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex*, at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).

A government official is entitled to qualified immunity in a § 1983 case "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th

---

[4] Beau was also put in handcuffs, walked down the driveway, and put in a different police vehicle.

[5] The charges were ultimately dismissed.

Cir. 2009). Courts undertake a two-step inquiry to make this determination: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 496. "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). "A right is clearly established if, 'at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.'" *Gerling v. City of Hermann, Missouri*, 2 F.4th 737, 741 (8th Cir. 2021) (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018)) (internal quotations omitted). A case need not be "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Moore-Jones v. Quick*, 909 F.3d 983, 985 (8th Cir. 2018) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). The burden falls to the plaintiff to establish both the violation and that it was clearly established. *Id.*

The qualified immunity analysis must be conducted as to each individual defendant for each of Plaintiff's §1983 claims. "We assess the reasonableness of each individual officer's conduct, because "§ 1983 liability is personal." *Frederick v. Motsinger*, 873 F.3d 641, 646 (8th Cir. 2017) (quoting *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005)).

Unless otherwise noted, ACRA claims will be "treated as coextensive with § 1983 and analyzed under federal standards." *Arnold v. McClinton*, 112 F.4th 598, 605 (8th Cir. 2024). *See also* Ark. Code Ann. § 16-123-105(c) (stating that a court may look for guidance to state and federal decisions interpreting § 1983).

## III. Analysis

A. Unlawful entry. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

*Wesby*, 583 U.S. at 56. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980). "At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States,* 365 U.S. 505, 511 (1961)). Given this strong language, it is no surprise that "[w]arrantless searches of a home are presumptively unreasonable under the Fourth Amendment" *Cotten v. Miller*, 74 F.4th 932, 934 (8th Cir. 2023) (citing *Michigan v. Fisher*, 558 U.S. 45, 47 (2009).[6] This presumption can be overcome if the officers establish that they have been given consent. *See Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998). Officers can also enter a home without a warrant "if the officers act with probable cause to believe that a crime has been committed and an objectively reasonable basis to believe that exigent circumstances exist." *Cotten* at 934.

Lawrence is only entitled to qualified immunity for his warrantless entry into Plaintiff's home[7] if he establishes consent or probable cause and exigent circumstances. Critical to this analysis, Defendants acknowledge that whether Beau gave valid consent for Lawrence to enter the home is a disputed fact question.[8] Turning to the issue of exigent circumstances, "the rationale for all exigent circumstance cases is the principle that if there is no reasonable basis for concluding there was a threat to life or property, the entry and search are deemed improper." *United States v. Selberg*, 630 F.2d 1292, 1295–96 (8th Cir. 1980). The Eighth Circuit has also

---

[6] Once a plaintiff establishes that the entry occurred without a warrant, defendants bear "the burden of going forward with evidence to meet or rebut the presumption" by producing evidence to satisfy an exception. *Der v. Connolly*, 666 F.3d 1120, 1128 (8th Cir. 2012). However, the plaintiff bears "the ultimate risk of nonpersuasion." *Id.*

[7] Plaintiff does not challenge the officers' entry into the barn.

[8] Plaintiff argues at length about consent, including the requirement under Arkansas law that officers are required to inform a person of their right to refuse consent for a home search. Since consent is acknowledged to be a disputed material fact, the Court need not address the issue here.

stated that exigent circumstances "may also be found when there is a compelling need for official action and there is no time to secure a warrant." *Radloff v. City of Oelwein, Iowa*, 380 F.3d 344, 348 (8th Cir. 2004). Since the standard is an objective one "a determination of whether a legal warrantless entry occurred focuses on whether a law enforcement officer acted with a reasonable belief that probable cause and exigent circumstances existed, not on whether either actually existed." *Ibid*.

Lawrence unequivocally stated in his deposition that there were no exigent circumstances that justified his entry into the home. (Doc. No. 18-1, p. 16). In fact, all three officers testified that they did not believe there were exigent circumstances to justify entering the home. Lawrence agreed that he could not have entered the home if he had not gotten consent. Defendants offered no evidence that there was an immediate threat to life or property while they were at the scene. Nevertheless, relying heavily on *Radloff*, Defendants argue exigent circumstances were nonetheless present by the potential loss of evidence such as "the identity and blood alcohol level of any [guest] who successfully fled the scene" and "the safety of overly intoxicated [guests]." (Doc. No. 14, p. 7, n. 1).

*Radloff* was a case, like this one, that involved a party with underage drinking. There the Eighth Circuit found that "[e]xigent circumstances existed both because of the loud noise created by the party and because of the threat to public safety if the juveniles left the house in cars while under the influence of alcohol." *Id.* at 348. The court stated that "[i]t would have been unreasonable to subject the neighbors to the loud noise or to require the officers to quarantine the juveniles' cars during the period of time it would have taken to obtain a warrant." *Id.* at 348.

Unlike *Radloff,* there was no evidence here of loud noise or complaints by Horne's neighbors. *See also Greiner v. City of Champlin*, 27 F.3d 1346 (8th Cir. 1994) (recognizing

"some governmental interest in dispersing the crowd in order to restore order and quiet during hours most citizens devote to sleep." *Id*. at 1353.) More importantly, there is no evidence that Lawrence believed a threat to public safety existed if the guests drove off, because he told them to leave. There was no evidence that the guests were visibly intoxicated. The officers made no effort to obtain the identity or the blood alcohol level of any guest, the evidence they now argue could have been lost if they had waited for a warrant. Under these particular facts, and consistent with his testimony, Lawrence has not established that he acted with a reasonable belief that exigent circumstances existed sufficient to overcome the presumption of unreasonableness inherent in a warrantless home arrest. Therefore, the Court finds that Lawrence's entry into the home was unreasonable.

The law was clearly established at the time of this incident that, absent an exception to the warrant requirement, warrantless entry into someone's home is unconstitutional. "It is well established that a warrantless arrest within the confines of the home, barring exigent circumstances, is unconstitutional." *Duncan v. Storie*, 869 F.2d 1100, 1102 (8th Cir. 1989). "[I]n the absence of exigent circumstances, an officer cannot reach over the threshold and into a person's home to forcibly effectuate a warrantless arrest." *Mitchell v. Shearrer*, 729 F.3d 1070, 1076 (8th Cir. 2013). "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590.

Whether Teague and Rains are protected by qualified immunity for their entry into the home is a separate question. The specific question relevant to this qualified immunity analysis is whether Teague and Rains violated Horne's constitutional rights when they entered the home without a warrant on the directive of their superior officer. Since they had gone to investigate the barn, Teague and Rains were not present to hear any exchange that might have occurred between

Lawrence and Beau regarding entry into the home. When they responded to Lawrence's radio call and entered the home, Beau and Lawrence were standing in the living room along with some guests. It was not a dynamic situation. While Defendants concede that whether Beau gave valid consent for Lawrence to enter the house is a disputed fact question, it was objectively reasonable for Teague and Rains to believe that Lawrence had been given consent to enter the home and to rely on that when they responded to his call. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1010 (8th Cir. 2017).

Plaintiff has not presented authority to clearly establish that a reasonable officer would understand that entering a home without a warrant in response to the directive of a superior officer who was already in the home was a constitutional violation under these circumstances. "[A] plaintiff must generally 'identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment,'" *Boudoin v. Harsson*, 962 F.3d 1034, 1039–40 (8th Cir. 2020) (quoting *Wesby*, 583 U.S. at 64)). "This factual 'specificity is especially important in the Fourth Amendment context, where ... '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12 and *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). "At the heart of this instruction is a simple principle: state actors 'are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' *Id.* at 1040 (citation omitted). Plaintiff failed to prove that the law was sufficiently clear that every reasonable officer would understand that entering the home under these circumstances was unlawful. Therefore, Teague and Rains are entitled to qualified immunity on Plaintiff's claim of unlawful entry.

B. <u>Unlawful arrest</u>. "It has long been established that warrantless searches and seizures inside a home are presumptively unreasonable." *Mitchell*, 729 F.3d at 1076. There is a well-

established exception if "the officers demonstrate the existence of probable cause and exigent circumstances." *Duncan*, 869 F.2d at 1102. "Probable cause exists "when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Ryno v. City of Waynesville*, 58 F.4th 995, 1005 (8th Cir. 2023) (cleaned up). "Because the qualified immunity privilege extends to a police officer who is wrong, so long as he is reasonable, the governing standard for a Fourth Amendment unlawful arrest claim 'is not probable cause in fact but arguable probable cause ... that is, whether the officer should have known that the arrest violated plaintiff's clearly established right.'" *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (quoting *Habiger v. City of Fargo,* 80 F.3d 289, 295 (8th Cir.1996)).

To determine whether exigent circumstances exist for the purposes of a warrantless home arrest, courts consider: "(1) seriousness of the alleged offense; (2) reasonable belief that the suspect is armed; (3) clear showing of probable cause to believe that the suspect committed the alleged offense; (4) strong reason to believe that the suspect is on the premises; (5) likelihood that the suspect will escape if not swiftly apprehended; and (6) entry may be made peaceably." *Duncan* at 1102 (8th Cir. 1989) (citing *United States v. Kulcsar,* 586 F.2d 1283, 1287 (8th Cir.1978)). "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *United States v. Evans*, 178 F.4th 416, 421 (8th Cir. 2026) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984)). The Supreme Court has held that "[t]he gravity of the offense for which a person is arrested has a crucial bearing on whether circumstances were exigent enough to justify a warrantless home arrest." *Greiner*, 27 F.3d at 1353 (citing *Welsh*).

Plaintiff has not established that Lawrence was personally involved in the arrest. He was

not in the home when the arrest was undertaken, nor was he aware that an arrest would occur. Since he was not personally involved in Horne's arrest, he is entitled to qualified immunity on the claim for unlawful arrest. *Kingsley v. Lawrence Cnty., Missouri*, 964 F.3d 690, 700 (8th Cir. 2020).

The analysis for Teague and Rains is different. Considering the totality of the circumstances, the Court finds that Teague and Rains had probable cause to believe that Horne had committed the misdemeanor crime of contributing to the delinquency of a minor pursuant to Ark. Code Ann. § 5-27-209. At the time they made the arrest, the officers had personal knowledge that underage guests had been consuming alcohol on Horne's property, they had witnessed two guests coming out of the home, and two guests had separately told the officers that Horne had been outside with them while they were drinking alcohol. In addition, the officers understood that Horne was the only person over legal drinking age at the property, and they were aware of an underage drinking party at Horne's property several months before. This is sufficient evidence to establish probable cause or at least arguable probable cause.

The Court finds, however, that Teague and Rains have not established that exigent circumstances existed for this warrantless home arrest. Significantly, the officers testified that they did not believe exigent circumstances existed. There was no indication of urgency seen in their body camera footage. The alleged offense was a non-violent misdemeanor. There has been no suggestion that the officers believed Horne was armed or otherwise dangerous. Finally, there was no indication that Horne would escape if not swiftly apprehended. On these facts, the Court finds that the actions of Teague and Rains violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure.

The question is whether the right was clearly established under similar circumstances at

the time the arrest was made. The Court finds that it was. At issue in *Patzner v. Burkett*, 779 F.2d 1363 (8th Cir. 1985) was "whether sufficient exigent circumstances existed to overcome the strong presumption that warrantless home arrests are *per se* unreasonable." *Id.* at 1368. There deputies had gotten a report that Patzner had been drinking and appeared intoxicated when he had struck another car. They went to Patzner's home to investigate. On getting a report from a co-resident that Patzner was in the kitchen, one of the deputies entered the house and told Patzner that he was under arrest. Patzner told the officer "that he was not going with her." *Id.* at 1366. He was nonetheless dragged from his home and charged with DUI.

In seeking qualified immunity for the warrantless home arrest, the deputies argued "the threat Patzner posed to the public safety and the need to ascertain Patzner's blood alcohol level" created exigent circumstances. *Id.* at 1368. The Eighth Circuit found the threat to public safety argument unconvincing—the evidence indicated that Patzner was home for the night, and the need to preserve evidence of BAC levels did not justify the home arrest. Here, the officers did not need Horne's BAC to establish the charge of contributing to the delinquency of a minor. This Court also finds there is no "legitimate question" as to whether an exception to the warrant requirement exists. *Id.* at 1370. Teague and Rains, who acted virtually simultaneously in effecting the arrest, are not entitled to qualified immunity for arresting Horne in his home without a warrant and without exigent circumstances.[9]

C. <u>Excessive Force</u>. "The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures." *City of Golden Valley,* 574 F.3d at 499. An arresting officer has the "right to use

---

[9] Again, the Court notes that Defendants are not relying on consent to supply the exception to the warrant requirement for purposes of their motion for summary judgment.

some degree of physical coercion or threat." *Graham v. Connor,* 490 U.S. 386, 396 (1989). The question is whether, "when viewed from the perspective of a reasonable officer on the scene," "the amount of force used was objectively reasonable under the particular circumstances." *Henderson v. Munn,* 439 F.3d 497, 502 (8th Cir.2006) (cleaned up).

Lawrence is entitled to qualified immunity on the excessive force claim since he was not present for or otherwise personally involved in the challenged use of force. *Dukeman v. Ste. Genevieve Cnty.*, 167 F.4th 500, 504 (8th Cir. 2026).

As to Teague and Rains, the body camera video shows Horne was sitting up in his bed, repeatedly telling the officers to get out of his home, when the officers pulled Horne out of bed. They took him down to the concrete floor in his bedroom where they grappled to get his arms behind his back to apply handcuffs. While the officers are yelling for Horne to give them his hands, and Beau can be heard telling his dad the same thing, it is not apparent from the video footage that Horne was resisting. Viewing the facts most favorably to Horne, he was not resisting when he was taken to the floor. He said felt Teague's knee jammed into his back as Teague stood up. He testified that he has bulging discs in his lower back and in his neck because of the force applied during arrest. He also testified that as he was being escorted down the driveway, Teague yanked on his arm several times causing his rotator cuff to tear, for which he underwent surgery and months of physical therapy.

In determining whether force used to effectuate an arrest is excessive, "[s]ome relevant considerations include: the severity of the crime; whether the suspect poses a threat of harm to others; whether the suspect is resisting arrest; and other factors, such as whether the situation is "tense, uncertain, and rapidly evolving," which would force an officer to make "split-second judgments" about how much force is necessary." *Coker v. Arkansas State Police*, 734 F.3d 838,

842–43 (8th Cir. 2013) (citations omitted). "The degree of injury suffered, to the extent it tends to show the amount and type of force used, is also relevant to our excessive force inquiry." *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012) (internal quotation omitted). The analysis requires courts consider the totality of the circumstances and balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bartz v. City of Minneapolis*, 170 F.4th 682, 686 (8th Cir. 2026) (quoting *White v. Jackson*, 865 F.3d 1064, 1074 (8th Cir. 2017)).

Horne was in his home, in his bed. Even if he had previously been outside drinking with the guests, he had the right "to retreat into his own home and there be free from unreasonable governmental intrusion." *Jardines*, 569 U.S. at 6. Contributing to the delinquency of a minor is not a severe or violent crime. There is no indication that the officers thought Horne might have access to a weapon or otherwise be dangerous. His hands were always visible. Once they pulled his covers away, they could see that he was only wearing his underwear. The guests were easy and cooperative around the officers and did not pose a threat. The situation was not rapidly evolving—in fact there was a stalemate. While Horne was visibly upset and yelled at the officers—to get out of his house, to not touch him or his things, that they were trespassing—he had not physically threatened them or moved to get out of his bed. He was not dangerous or fleeing. The officers did not tell him he was under arrest. When Horne said he was calling the sheriff and would not hand over his phone or terminate the call, Rains reached across the bed and hauled Horne to the floor with Teague's assistance. In light of this evidence, the Court finds that whether the officers reasonably interpreted Horne's refusal to get off the phone and "hop up" as actively resisting arrest or "whether it constituted nothing more than an affront to [the officers'] command authority is a matter for a jury to decide." *See City of Golden Valley*, 574 F.3d at 497.

It was clearly established at the time of Horne's arrest that an officer entering the home of a "non-violent nonthreatening misdemeanant who was not actively resisting arrest[10] or attempting to flee" could not forcefully take the misdemeanant down in a violent manner. *Karels v. Storz*, 906 F.3d 740, 747 (8th Cir. 2018). In *Karels*, the plaintiff was in her garage, arguably "loud, aggressive, argumentative, and resistant," when she was told she under arrest and to put her hands behind her back. The officer had one of the plaintiff's wrists in handcuffs when he perceived resistance. He responded by twisting the plaintiff's arm behind her back and body-slammed her to the concrete floor. *Ibid.* Horne was also a non-violent, non-threatening misdemeanant who was not attempting to flee. Like *Karels*, the Court finds there is a fact question as to whether Horne was resisting arrest. Under these circumstances, Teague and Rains are not entitled to qualified immunity. *See also Shannon v. Koehler*, 616 F.3d 855, 863 (8th Cir. 2010) (holding it was not reasonable for the officer to use more than de minimis force against a suspect who had not committed a serious crime, was not threatening, was not resisting arrest, and not fleeing); and *Patzner* (whether the officers used excessive force was a fact question when they dragged an initially uncooperative misdemeanant through the house, ignoring his agreement to cooperate, resulting in his "extreme humiliation"). [11]

D. Claims against Craighead County. A suit against Sheriff Boyd in his official capacity

---

[10] The Eighth Circuit agreed with the district court that whether Karels was resistant was a jury question.

[11] The Court recognizes that a significant factor in the Eighth Circuits decision in *Pazner* was that Pazner was a double amputee with who wore prosthetic legs and a used wheelchair, neither of which the officers retrieved for him before dragging him through the house, into the car, and up the stairs for booking. Though certainly not as extreme an insult or injury, parading Horne down the gravel driveway pasts his son's friends in his underwear and ignoring his repeated requests to be allowed to put on some clothes also raises a fact question as to whether Horne's Fourth Amendment right to "privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers" was violated. *True v. Nebraska*, 612 F.3d 676, 680 (8th Cir. 2010) and *State v. Robinson*, 430 S.W.3d 105, 109 (Ark. 2013).

is treated as a suit against the county. *Liebe v. Norton*, 157 F.3d 574, 578–79 (8th Cir. 1998). "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Indep., MO.*, 829 F.3d 695, 699 (8th Cir. 2016) (cleaned up). Each of these bases for county liability requires a different analysis.

To rely on an official policy to establish liability, a plaintiff must identify "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the County's] officers." *Mitchell v. Saint Louis Cnty., Missouri*, 160 F.4th 950, 964 (8th Cir. 2025) (quoting *Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 935 (8th Cir. 1991)).

A plaintiff can establish an unofficial custom, by proving: (1) the existence of "a continuing, widespread, persistent pattern of unconstitutional misconduct" by county employees; (2) "deliberate indifference to or tacit authorization of such conduct" by the county's policymaking officials after having notice to of that misconduct; and (3) that the custom was the cause of the plaintiff's injuries. *Ibid.* (citation omitted).

On a failure to train theory, a plaintiff must establish that the failure to train rose to the level of deliberate indifference to the constitutional rights of those affected. *City of Canton v. Harris,* 489 U.S. 378, 389 (1989). "To have been deliberately indifferent, the City must have 'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.'" *Cameron v. City of Des Moines*, 168 F.4th 522, 532 (8th Cir. 2026) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996)). "Notice may be implied where the failure to train is so likely to result in a constitutional violation that the need for training is patently obvious[.]" *P.H. v. Sch. Dist. of Kansas City, Missouri*, 265 F.3d 653, 660 (8th Cir. 2001) (citing *Thelma D.*

at 934). In some circumstances, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. *Canton*, 489 U.S. at 390.

Plaintiff makes two arguments for municipal liability. First, he says Craighead County's policy or custom of not advising an individual that they had the right to refuse consent to enter a residence violates the Arkansas Constitution. Emphasizing "that a person's home is a zone of privacy is as sacrosanct as any right or principle under our state constitution and case law," the Arkansas Supreme Court decided two decades ago that "though the United States Supreme Court has not required it, the better practice in conducting a knock-and-talk investigation would be for the officer to identify himself and advise the occupant of his right to deny entry." *State v. Brown*, 156 S.W.3d 722, 730 (Ark. 2004) (citation omitted.). Two years later, the court held that "an individual's right to be informed that he or she may refuse to give consent to search is well established." *City of Farmington v. Smith*, 237 S.W.3d 1, 6 (Ark. 2006). *See also Woolbright v. State*, 160 S.W.3d 315, 326 (2004) (finding the search unconstitutional when "[i]t is undisputed that none of the officers informed Mr. Johnson that he had the right to refuse consent to the entry and subsequent search of his home.).

In 2019, Ark. R. Crim. P. 11.1 was amended to add subsection (c): "A search of a dwelling based on consent shall not be valid under this rule unless the person giving the consent was advised of the right to refuse consent." Ark. R. Crim. P. 10.1 defines "search" as:

> any intrusion other than an arrest, by an officer ... upon an individual's person, property, or privacy, for the purpose of seizing individuals or things or obtaining information by inspection or surveillance, if such intrusion, in the absence of legal authority or sufficient consent, would be a civil wrong, criminal offense, or violation of the individuals' rights under the Constitution of the United States or this state.

The Arkansas Court of Appeals cut to the essence of this rule in *Virgil v. State*, 603 S.W.3d 603 (Ark. App. 2020), stating that "any intrusion . . . upon an individual's person, property, or privacy" means just what it says." *Id.* at 611.

Therefore, it is established that Arkansas law requires officers to advise occupants that they have the right to refuse consent to allow law enforcement to enter their home. In line with this law, Craighead County has a written policy that states: "When dealing with a residence, the person granting consent must be told that they have the right to refuse consent." (Doc. No. 13-13, p. 145). However, in spite of this written policy, Sheriff Boyd testified that officers were not trained to notify an individual that they had the right to refuse consent for officers to enter a residence. They were trained only to advise that an occupant had the right to refuse a search. Each of the officers also testified that he was not trained to advise individuals of the right to refuse consent to enter a residence. Notice can be implied that this deficiency in the training of Craighead County officers would lead to violations of the Arkansas Constitution as is argued here. The issue of consent generally is a disputed fact Defendants are not relying on to establish their motion for summary judgment. But it is undisputed that none of the officers advised Horne or his son of the right to refuse entry, nor were they trained to do so. A jury could find that Craighead County's policy of not training officers to advise individuals of the right to refuse consent to enter a residence led to the claimed unlawful entry. Therefore, the County is not entitled to summary judgment on the ACRA claims against it for failure to train. It is, however, entitled to summary judgment on the federal claims for failure to train.

Plaintiff's second argument for municipal liability is that Craighead County had an unconstitutional practice of ordering private citizens into places that a law enforcement officer could not constitutionally enter. Plaintiff is referring to the facts that the officers ordered Beau to

go inside and get his dad so they could talk to him. The two cases cited by Plaintiff to establish the County's liability for this claim—*Skinner v. Railway Labor Executives' Association,* 489 U.S. 602 (1989) and *Pingatore v. Union Pac. R.R. Co.*, 530 S.W.3d 372 (Ark. App. 2017)— address the issue of whether the collection of physical evidence (blood, breath and urine samples) by third parties as part of Federal Railroad Administration regulations were reasonable under the Fourth Amendment. Those cases are not relevant to the issue raised by Plaintiff here.

E. Individual claims against Sheriff Boyd.

To establish supervisory liability for a § 1983 claim for a failure to train, a plaintiff must first establish that an officer committed an unconstitutional act. *Mitchell v. Saint Louis Cnty., Missouri*, 160 F.4th 950, 961 (8th Cir. 2025). Then, a plaintiff must prove "that the supervisor '(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury" to plaintiff. *Id.* (quoting *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012).

It is undisputed that Sheriff Boyd did not train officers that they were required by Arkansas law to advise occupants that they had the right to refuse entry into their residence. While consent is contested at this point, a jury could find that the officers did not have proper consent to enter the home in part because they did not advise Beau or Horne of their right to refuse consent to enter. Notice can be implied that the deficiencies in Sheriff Boyd's training would lead to an unconstitutional entry and search. On these facts and pursuant to the cases discussed in the previous section, Sheriff Boyd is not entitled to qualified immunity on the ACRA individual liability claims against him. But he is entitled to federal immunity since the claims arise out of law specific to Arkansas.

F. State law privacy claims.

1. Intrusion upon seclusion. To establish an invasion of privacy claim for intrusion upon seclusion, a plaintiff must establish: (1) that the plaintiff sustained damages; (2) that the defendant intentionally intruded physically or otherwise upon plaintiff's solitude or seclusion and believed or was substantially certain that the defendant lacked the necessary legal authority or personal permission, invitation, or valid consent to commit the intrusive act; (3) that the intrusion was of a kind that would be highly offensive to a reasonable person, as the result of conduct to which a reasonable person would strongly object; (4) that the plaintiff conducted himself or herself in a manner consistent with an actual expectation of privacy; and (5) that the defendant's intrusion was the proximate cause of the plaintiff's damages. *Dillard v. City of Springdale, Arkansas*, No. 5:17-CV-5089, 2022 WL 403287, at *6 (W.D. Ark. Feb. 9, 2022) (quoting *Duggar v. City of Springdale*, 599 S.W.3d 672, 683 (Ark. Ct. App. 2020)). The Arkansas Court of Appeals has held that an intrusion is not limited to "crossing the threshold" but encompasses "acts that purportedly encroached upon [plaintiff's] physical self and personal dignity." *Coombs v. J.B. Hunt Transp., Inc.*, 388 S.W.3d 456, 461 (Ark. App. 2012).

Plaintiff has established sufficient facts on each of these elements to survive Defendants' motion for summary judgment. Mary Horne testified about the emotional impact Defendants' actions caused her husband. Whether Defendants had consent to enter the home is disputed, and whether Defendants had the legal authority to do so will be up to a jury. The act of parading Horne past his son's guests wearing only his underwear, ignoring his requests to be allowed to put on his clothes, would be highly offensive to a reasonable person. Horne conducted himself with a valid, and constitutionally protected, expectation of privacy. The Court finds that Defendants have not established a right to judgment as a matter of law on this claim.

2. Public disclosure of private facts. A plaintiff must establish the following elements to prove a public disclosure of private facts: "(1) that plaintiff sustained damages; (2) that defendant made a public disclosure of a fact about plaintiff; (3) that prior to disclosure the fact was not known to the public; (4) that a reasonable person would find the disclosure highly offensive; (5) that defendant knew or should have known that the disclosed fact was private; (6) that the fact was not of legitimate public concern; and (7) that the public disclosure was the proximate cause of the plaintiff's damages." *Dillard*, at *7–8) (quoting *Duggar* at 684) (cleaned up). "Public disclosure of private facts is publicity of a highly objectionable kind, given to private information about the plaintiff, even though it is true and no action would lie for defamation." *McMullen v. McHughes Law Firm*, 454 S.W.3d 200, 209 (Ark. 2015).

At least one of Beau's guests videoed Horne's walk down the driveway to the police car wearing nothing but his underwear and published it on social media. Defendants argue that Plaintiff cannot establish the second element, that it was Defendants who made the public disclosure of a private fact. Plaintiff responds that the video was only the amplification of the disclosure. The private party at the Horne property was not open to the public. The Court agrees that Defendants were not responsible for publishing a private fact about Plaintiff to the public, and they are entitled to summary judgment on this claim.

IV. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (Doc. No. 13) is GRANTED in part and DENIED in part as follows:

1. Defendant Lawrence is not entitled to qualified immunity on the claim of unlawful entry. Defendants Teague and Rains are entitled to qualified immunity on this claim.

2. Defendant Lawrence is entitled to qualified immunity on the claim for wrongful arrest.

Defendants Teague and Rains are not entitled to qualified immunity on this claim.

3. Defendant Lawrence is entitled to qualified immunity on the claim of excessive force. Defendants Teague and Rains are not entitled to qualified immunity on this claim.

4. Craighead County is DENIED summary judgment on the claim that the training of its officers resulted in a violation of the Arkansas Constitution; it is GRANTED summary judgment on the federal constitutional claims.

5. Sheriff Marty Boyd is DENIED summary judgment on the claim that his training of Craighead County officers resulted in a violation of the Arkansas Constitution; he is GRANTED summary judgment on the federal constitutional claims.

6. Defendants' motion for summary judgment on the state law claim for invasion of privacy by intrusion upon seclusion is DENIED.

7. Defendant's motion for summary judgment on the state law claim of public disclosure of private facts is GRANTED.

IT IS SO ORDERED this 18th day of September, 2026.

UNITED STATES DISTRICT JUDGE